No. 20,605.

THE WELSBACH STREET LIGHTING COMPANY, *Appellant,* v.
THE CITY OF WICHITA, *Appellee.*

### SYLLABUS BY THE COURT.

1. STREET LIGHTING CONTRACT—*Expiration of Contract—Waiver of Contract Rights.* A waiver of a contract right implies a voluntary and intentional renunciation of it, and some positive act or positive inaction inconsistent with the contract right is necessary to create a waiver.

2. SAME—*Waiver of Contract Rights—Estoppel.* Where the element of estoppel is involved in a waiver of a contract right, there must be some willful misrepresentation or fraudulent conduct tending to mislead or prevent the other party to the contract from doing what it is privileged to do to protect its rights.

3. SAME—*Notice of Expiration Not Given—Contract Renewed.* The plaintiff company made a contract with the defendant city to light its streets "for the term of five years, from the first day of July, 1905; it being mutually understood that this contract shall continue for another term unless official notice be given by either party to the other sixty days before its expiration." No official notice was given to terminate the contract. The defendant city sought to prove a waiver of the sixty-days official notice by the following incidents: (*a*) An unaccepted proposition offered by plaintiff suggesting changes and economies in the city's lighting system and an unaccepted offer to change the existing contract; (*b*) the drafting of a proposed but unadopted lighting ordinance by plaintiff's attorney at the suggestion of a city commissioner and pursuant to an agreement at a conference in the mayor's office; (*c*) the plaintiff's participation in a competitive exhibition of street-lighting systems at the city's invitation, which recited that the city's street-lighting contracts would soon expire; (*d*) the plaintiff's participation in competitive bidding for a new contract for street lighting; (*e*) a voluntary, unauthorized statement by plaintiff's attorney (and unaccepted by defendant) that if a new contract were awarded to another lighting company the plaintiff would continue its lighting service until the new company's lighting system was installed. *Held,* that these incidents do not establish a voluntary and intentional waiver of plaintiff's contract right to an official sixty-days notice to terminate its existing contract, and that these incidents did not mislead or prevent the city from giving the requisite notice, and do not estop the plaintiff to recover on its contract for services to the city, and for the city's breach of the contract.

Appeal from Sedgwick district court, division No. 1; THOMAS C. WILSON, judge. Opinion filed October 6, 1917. Reversed.

*S. B. Amidon, W. M. Dedrick,* both of Wichita, and *J. W. Dana,* of Kansas City, Mo., for the appellant.

*Earl Blake,* and *J. N. Haymaker,* both of Wichita, for the appellee; *R. C. Foulston,* city attorney, of counsel.

The opinion of the court was delivered by

DAWSON, J.: This lawsuit arises out of a contract for lighting the streets of Wichita and an alleged breach of that contract. In 1905, the Welsbach Street Lighting Company, plaintiff, entered into a contract with the city of Wichia, defendant, whereby the plaintiff undertook to furnish two hundred street lamps and their equipment, and to maintain and light these lamps along the streets, alleys and public grounds of Wichita, and to furnish, equip and maintain as many more such lamps as might be required by the city. The agreed price to be paid for this service was $27 per lamp, per annum, payable monthly. The contract was to endure—

"For the term of five (5) years, from the first day of July, 1905; it being mutually understood that this contract shall continue for another term unless official notice be given by either party to the other sixty (60) days before its expiration."

Pursuant to this contract the plaintiff supplied some 430 street lights for five years; and no official or formal notice being given by the city to terminate the contract relationship, the plaintiff continued the service for about two and a half years thereafter, when it was ordered by the city to remove its lamps from the streets. The city paid the monthly charges for the first five years ending June 30, 1910, and also for the months of July, August, September and October, 1910. It paid nothing thereafter.

On June 2, 1913, the city commission adopted a resolution:

"*Be it Resolved, etc.,* That the Welsbach Street Lighting Company be and it is hereby ordered and directed to at once remove said lamps and poles from the streets of said city."

The plaintiff thereupon discontinued its service, removed its property, and commenced this action, in two counts, one for services under its contract from November 1, 1910, until June 7, 1913; and another for damages for breach of contract for the remainder of its duration—until June 30, 1915.

The city offered to confess judgment for plaintiff's services for November, 1910. Answering further, defendant pleaded

a number of incidents, correspondence, and interviews between attorneys for the plaintiff and officials of the city all of which transpired within a few months just prior to the end of the first five-years period, and which the city relied upon to show that plaintiff had waived the sixty-days official notice of the city's intention to terminate the contract.

The district court gave judgment for plaintiff for its street-lighting services for the month of November, 1910—no more; and the plaintiff appeals.

The city took no direct formal action to terminate the contract, nor to give the plaintiff official notice of intention to do so; and the question whether the incidents, correspondence and interviews pleaded and proved by defendant amounted to a waiver of the notice provided by the original contract is the crux of this lawsuit.

The most significant of these will be reviewed.

(a) In November, 1909, the attorney for plaintiff wrote to the mayor and commissioners urging the lighting of the residence districts of Wichita with natural gas and suggesting other economies, etc.—

"You are paying $27.00 a year for gasoline lights standing on streets traversed by gas mains to the extent of some 300, which you might be getting under our proposition for a net cost to the city of $15.00 for service and $5.00 for gas. This is poor business policy, and can not be justified by any public officer or taxpayer. . . .

.    .    .    .    .    .    .    .    .    .    .    .    .

"Though The Welsbach Street Lighting Company is entitled to six or eight months service yet at $27.00, we are willing to cancel that contract in the interest of a better service to the city at large, which will be a pleasure to us as well as a great convenience to the citizens.

"In consideration of the foregoing conditions confronting your city, we propose to tender you an attractive proposition at your next regular session."

Nothing came of that proposition, and no element of defense to the contract can be founded thereon. An offer to cancel a contract amounts to nothing unless it is accepted.

(b) In January, 1910, the company's attorney prepared an ordinance at the suggestion of one of the city commissioners, and mailed it to him with a letter saying that the ordinance had been redrafted pursuant to an agreement "at the conference in the mayor's office the other day." This proposed ordinance provided for the lighting of the city by plaintiff, partly

Street Lighting Co. v. City of Wichita.

by natural-gas street lamps and partly by gasoline lamps, prices specified, etc., for ten years, and provided that the ordinance might be repealed and the contract abrogated after five years on ninety days' written notice and on payment by the city of five dollars for each lamp then installed by the plaintiff.

Nothing came of that proposed ordinance, and no legal consequences attach to the fact that there was a conference between plaintiff's attorneys and the city officials concerning it, nor does any legal effect attach to the fact that the proposed ordinance was drawn or revised by plaintiff's attorney and transmitted to a city commissioner with an accompanying letter which discussed some of its provisions.

(c) On February 8, 1910, the city adopted a resolution:

"WHEREAS, The contracts for street lighting heretofore entered into by the city of Wichita will expire in the near future; and

"WHEREAS, The city of Wichita is desirous at this time of making new contracts for the lighting of the streets and alleys of said city, and

. . .

"Now therefore be it resolved by the Board of Commissioners of the city of Wichita:

"That the Welsbach Street Lighting Company, the Edison Light & Power Company, and Wichita R. R. & Light Co., are hereby requested and authorized and are hereby empowered by this board of commissioners to install their lighting system on any block in the city of Wichita within fifteen days from the date hereof, selected by such company in order to demonstrate the efficiency of their lights and lighting system, lights to be located under direction of commissioner of 'lights."

The plaintiff installed four or six lights pursuant to this resolution, and some were also put up by a competitor. No element of waiver arises from compliance with this request.

(d) On April 19, 1910, the city adopted a resolution reciting that, whereas—

"The contracts now in force for the lighting of the streets and avenues and public grounds of the City of Wichita, expire on the 31st day of June, and the 7th day of September, 1910, now, therefore,

"It is hereby declared to be a public necessity to light the streets, avenues and public grounds of the City of Wichita, . . .

"Be it resolved further, That the City Clerk is hereby instructed to advertise for bids for ligthing the streets, avenues and public grounds of the City of Wichita, bids to be upon a minimum number of six hundred (600) lights, with the right to add as many more, as may be ordered, . . . designating the candle power of each light on a five years, or a ten years contract, or both."

On April 23, 1910, the plaintiff filed its written offer and bid to furnish lights pursuant to the city's resolution of April 19, and this is the principal incident relied upon by the city as a waiver by the plaintiff of the sixty-days official notice of the city's purpose to terminate the contract.

In the oral argument it was contended by counsel for the city that if the plaintiff intended to stand on the contract of June, 1905, and intended to insist on literal compliance with the contract provision relating to its termination, the plaintiff should have held absolutely aloof from all participation in the bidding and proposed letting of a new lighting contract; and that the plaintiff imperiled all its rights under its old contract by participating in this new competitive bidding. A majority of this court decides otherwise. There was no reason why the plaintiff should not compete in the bidding. It had a contract terminable in a few weeks at its own option on sixty-days notice or at the option of the city on sixty-days notice. By bidding it might get a better contract, or it might by bidding get a less satisfactory contract than its old contract but still one worth accepting rather than go out of business in Wichita. On the other hand, the city risked nothing by calling for new bids by holding out to competitors the prospect of a new contract. If a more favorable contract than the city had with the plaintiff could be secured—well and good; it could terminate its contract with plaintiff on sixty-days notice. If a more favorable contract than the one it had with plaintiff could not be obtained, no harm could come of the city's endeavors to that end since it still had a five-years lighting contract which it could enforce against the plaintiff—unless the plaintiff gave a sixty-days notice of an intention to quit. Both parties were bound for five years longer unless the formal steps were taken by one of them to terminate this contract; and a majority of the court can discern no semblance of waiver in the conduct of either party—neither in the city's attempts to get a more favorable contract, nor in plaintiff's looking out for its future employment on a new basis, if its employment on the old basis was to be terminated.

Promptly when the time had expired in which the city might have given the official notice to terminate its contract with the plaintiff, the latter filed with the city, May 3, 1910, a com-

munication referring to the contract of 1905 and the terms
upon which it might have been terminated, and—

"*Whereas*, The time in which either of the parties hereto were en-
titled to elect to terminate this contract expired at 12:00 o'clock, p. m.,
May 1st, 1910, and neither of the parties hereto have made such election
in the manner provided by said contract.

"*Now, Therefore*, The Welsbach Street Lighting Company hereby
accepts said contract and all the terms, conditions and provisions therein
contained for a term of five years from July 1st, 1910, and requests the
City Clerk to file this instrument as an acceptance of said contract and
a notice to the City of the election of the Company to continue the
service thereunder."

The record contains many other exhibits, letters, minutes,
etc., which the court has examined with care, but they are
all of little or no significance. The oral evidence tended to
support the allegations of plaintiff's petition so far as they
were in need of oral evidence for such purpose. The city
clerk was asked:

"I will ask you to state whether or not the journal records show any
action of the Mayor and Commissioners electing to determine to termi-
nate its contract on or prior to May 2, 1910? A. Directly in so many
words, I would say no."

Much of defendant's evidence was admitted over objection
and many errors are assigned thereon, but these may need
no consideration.

One feature of the city's defense was the oral testimony
of a witness who had been city clerk in 1910, and who had
attended all the meetings of the city commission. Over ob-
jection he was permitted to testify that on April 25, 1910, he
was present at a meeting of the city commissioners, and that
two of plaintiff's attorneys were present; his testimony being
as follows:

"Q. I will ask you if you remember anything that was said relative
to the lighting the streets after July 1st, 1910, by either Mr. Amidon or
Mr. Dana? . . . A. I do.

"Q. I will ask you to state that conversation in detail, as fully as you
can; and if not fully, the substance? . . . A. My recollection is that
both gentlemen were present.

"By the Court: Now name the gentlemen. A. Mr. Dana and Mr.
Amidon. Some member of the commission raised the question of light-
ing the streets after July first in case the Company that secured the
contract did not have them installed at that time. My recollection is
that Mr. Amidon made a remark in substance like this, 'There will be

no trouble about that matter.' And that Mr. Dana assented. My reason for recollection—   . . .

"Q. In what way did Mr. Dana assent? A. My recollection is by a nod of the head. . . .

"Q. Was Mr. Amidon's statement made in response to some inquiry? A. That is my recollection.

"Q. Do you remember who made the inquiry? A. My recollection is, it was the mayor, Mr. Davidson. . . .

"Q. Do you ·remember the substance of the inquiry? A. I have stated it. A query relative to the continuance of the contract of lighting in case the Company that secured the new contract 'did not have it installed by July first. . . .

"Cross-examination . . . by Mr. Amidon . . .

"Q. Now you say I was the one that made the statement? A. That is my recollection. . . .

"Q. Your recollection is that I said there would be no trouble about the continuance of the service? A. Yes, sir; or words to that effect. . . .

"Q. I did not say whether it would be done under the old contract or new contract? A. You did not. ₐₑ

"Q. And you did n't know whether it would be under the old contract or new contract, did you? A. No, I did n't know. . . .

"Q. When I said there would be no trouble about continuing the lights, Dana nodded his head? A. That is my recollection. . . .

"Q. And you have nothing in any record to refresh your recollection at all? A. I have not. . . .

"By the Court: Is it customary to incorporate into the council proceedings, or the commissioners' proceedings, statements made by persons other than members of the board? A. No, judge. If a question was up for discussion and no action taken, that never got into the minutes. Only the real actions. For instance, when they did anything. If any matters or discussions, where a thing was under discussion, and nothing was ever done, that never went into the minutes. It was only what— (Interruption).

"By the Court: Suppose something was done? A. Then it went into the minutes.

"By the Court: What went into the minutes? A. What was done; not what was said. . . .

"Q. Then, if anything was done upon what I said there, it would have been taken down, would n't it? A. There was nothing done. . . .

"Q. Then your contention is now whatever I said was said in the general discussion there? A. Yes, sir.

"Q. And nothing was done by either side in relation thereto? A. That is exactly the point."

One of the city commissioners testified to the same effect:

"A. Mr. Amidon made the statement that the lights of the Welsbach Company that were in use, that they would be continued at the same

Street Lighting Co. v. City of Wichita.

price as they now were being paid for by the city until the expiration of the contract, or that the new system would be installed. . . .

"Q. Did Mr. Dana say anything or take part in that discussion?  A. Nothing very particularly. . . .

"Q. I said that the Welsbach people would continue lighting the city until the contract expired and until a new system was installed; that is it, is it?  A. Practically; yes, sir."

Another commissioner testified that he had several conversations with a representative of the plaintiff.

"Q. Now what conversation did you have with Mr. Grear? . . . A. I say he just came in there negotiating and wanting to get a contract for the lighting of the streets.  That was his business in there. . . .

"Q. Did you have any conversations with Mr. Dana?  A. I did. . . .

"Q. What did Mr. Dana say about wanting a contract? . . . A. Well, now, he went ahead and stated that it would be better for the city to hire their installation of natural gas; put up his ideas on it, and so on; that was the general substance.  That it would be a better contract than to take the other contract.  Now that was in general substance what was said. . . .

"Q. Do you remember anything that was said by Mr. Dana or Mr. Amidon at that time relative to continuing the lighting after the expiration of the five-year period or their contract, and up to the time the Kansas Gas & Electric Company had its lights installed, its lights ready for use? . . . A. We were sitting at a table holding a meeting, and I said if this company wasn't going to get their installation in until after the expiration of the present contract, and I said that the city was going to be left in darkness; and Mr. Amidon said that they would take care of that; that they would light on until the other installation was in. . . .

"By the Court:  Mr. Blake, I would like to ask whether this was before or after the contract was awarded to the Kansas Gas & Electric Company.

"Defendant's Counsel:  Mr. Sence says it was before it was awarded. Mr. Roetzel and Mr. Means remember it as of a later date."

On cross-examination:

"Q. Now, Mr. Means, nothing was said by either Mr. Dana or Mr. Grear or myself about waiving any of the conditions of the original agreement, was there? . . . A. I don't think so."

No waiver of the requisite sixty-days notice to terminate the contract can justly be deduced from this evidence. It fairly means, if the objections to its disputed competency be ignored, and if the question of the authority of plaintiff's attorneys to make such a promise be disregarded, and if the question of the city's right to make a binding oral acceptance be likewise ignored (*Water Co. v. City of Wichita,* 98 Kan. 256, Syl. ¶ 3, 158

Pac. 49), that should the city decide to terminate its contract with plaintiff and to let a new contract to another company the plaintiff would not discommode the city but would furnish lights until its successor could do the work effectively. The foregoing are the principal incidents gleaned from the lengthy record upon which the fact of waiver of the sixty-days official notice to terminate the contract is attempted to be established, and a majority of the court is impelled to hold that they fall far short of a waiver. A waiver of a contract right is a voluntary and intentional renunciation of it, and some positive act or some positive inaction inconsistent with the contract right is necessary to create the waiver. (*Long v. Clark,* 90 Kan. 535, 135 Pac. 673; 40 Cyc. 253-263; 8 Words and Phrases, 7375-7381.) Where estoppel is involved as an element of the waiver there must be willful misrepresentation, or fraudulent conduct misleading and tending to prevent the other party from taking the proper steps to enforce or protect his rights. (*Clark v. Coolidge,* 8 Kan. 189, 196; *Debenture Co. v. Hopkins,* 63 Kan. 678, 66 Pac. 1015; *Ergenbright v. Henderson,* 72 Kan. 29, 82 Pac. 524; *Schott v. Linscott,* 80 Kan. 536, 103 Pac. 997.) It can not be pretended that the plaintiff voluntarily, knowingly, or intentionally did anything which prevented the defendant from giving the sixty-days official notice or which misled the city into believing that plaintiff was waiving the sixty-days official notice to terminate the contract. In nearly all the incidents cited to prove the waiver, the city was taking the initiative, and the plaintiff's conduct was no more than mere complaisant acquiescence, and looking out for the chance of future employment by the city if its existing contract was in fact to be terminated. It can not be said that it was incumbent upon the plaintiff to remind the defendant of the specific terms upon which the existing contract might be terminated, and no element of bad faith in plaintiff's conduct can be discerned. The city's predicament is not the fault of the plaintiff. The city officials should have familiarized themselves with the city's contract. Common prudence should have prompted them to know what sort of a contract for street lighting they had before they set about the procurement of another. Some of the city officials testified that they had never read the contract until after they were notified on May

3, 1910, that plaintiff would continue to serve the city for five years longer in accordance with its terms.

Commissioner Means testified:

"A. It was my understanding it [the contract of 1905] was for five years.

"Q. You had no actual knowledge of it?  A. No, I had never seen the contract."

When the time had expired in which notice might have been given to terminate the contract, and when the plaintiff had notified the city that it would continue its service for five years longer in accordance with the contract, the city attorney made a belated examination of the contract, and in discussing the matter with the commissioner of water and lights, he said:

"And at that time I told Mr. Means that we had gotten into a bad mess, and that we should have to make the best of it."

If prompt action had then been taken, without much trouble and at little cost, the city could have extricated itself from its dilemma caused by the negligence of its officials in failing to examine the city's rights, duties and liabilities under its outstanding contracts.  At that time, while a new lighting contract had been awarded, it had not been executed and nothing had been done under it, and the city's liability to the new company, if any, would have been but nominal.

A number of other points, mostly technical, which are pressed by plaintiff will need no discussion.

In defendant's answer it was pleaded that on January 16, 1911, the plaintiff had filed a suit in the federal court praying for an injunction against the city and its officers and to restrain them from removing the plaintiff's lamps, posts and equipment.  Plaintiff therein pleaded the contract now under scrutiny.  A restraining order was issued.  The defendant answered, setting up many of the matters which we have noticed above, but with much more detail as to the waiver. It was alleged in the federal case that plaintiff's local superintendent had waived the notice formally at an open session of the city commission.  The cause was set down for hearing on the bill and answer and it was argued.  The trial judge held:

"Again from the pleadings, it is evident the question of merit desired to be litigated between the parties is this:  Does complainant have with defendant a valid enforceable contract binding complainant, on the one

hand, to furnish light to the defendant city for a period of five years, and the defendant, on the other hand, to receive the performance of such service and pay for it, for the reason the City failed to give such notice as the contract provides to terminate it, or, whether complainant by its acts and conduct has waived such notice and is now estopped from asserting the existence of such contract?

"The more orderly procedure, to my mind, requires the issue so raised to be determined on full proofs. Under the pleadings as framed I am of the opinion the answer is sufficient to raise such issue for determination on the proofs."

The city offered in evidence a memorandum decision of the federal court on the sufficiency of the city's answer in the injunction suit.

"Plaintiff's Counsel: We object to it as incompetent, irrelevant and immaterial, not within the issues of this case, and not tending to prove or disprove any matter in dispute in this case.

"By the Court: I don't see how that is competent. The objection is sustained.

"To which ruling of the court the defendant excepts."

Then the city offered in evidence an order of the federal court dismissing the suit.

"Plaintiff's Counsel: To the introduction of which the plaintiff objects as incompetent, irrelevant and immaterial, and not within the issues of this case.

"By the Court: The objection is sustained.

"To which ruling of the court the defendant excepts."

No cross-appeal is brought here by the city to question the correctness of the trial court's rulings on these matters, yet defendant's brief gives considerable space to the federal court case.

From what is quoted above, it will be seen that the federal trial judge understood the principal issue between these litigants as we do. But there was no decision. The ruling merely was that if the evidence would show a waiver the plaintiff would fail; if conduct creating an estoppel were disclosed the defendant would take judgment. But there was no judgment on the merits; the case was dismissed; and since the trial court in the case at bar ruled out all the evidence pertaining to the federal case, the want of a cross-appeal on that ruling entitles the point to less attention than we have given it, for, in strictness, it is entitled to none.

Defendant's brief is an exhaustive presentation of the law of both waiver and estoppel. But the facts on which to found

an estoppel are altogether wanting, and a majority of this court are unable to find any tangible ground upon which the city can defeat the plaintiff's claim for the services performed and for the breach of the contract; nor can anything be indicated which necessitates or which would give an excuse for a new trial. The services were performed according to the contract for about two and a half years, and must be paid for. The contract was then breached, and the plaintiff's damages were proved and undisputed. It follows that the judgment of the district court must be reversed and the cause remanded with instructions to enter judgment for the plaintiff.

JOHNSTON, C. J., and MASON, J., dissent.